We have two argued cases this morning. The first is No. 17-2423, Quest Integrity USA v. Cokebusters. Mr. Moore. Good morning, Your Honors, and may it please the Court. The central issue, I think both sides agree that the display limitation is the only issue, right? Your Honor, respectfully, the display limitation, I would say, is the central issue with respect to two of the claims, 30 and 40. Yes, I understand, with the exception of 30 and 40. That's correct. Put those aside. So what confuses me is what the display limitation covers. I guess there could be two things within the display limitation. One, being able to fix the location of the defect in relation to physical geometry of the tubing, and second, displaying that information in a way that it looks like the furnace coiling. And we have this example one in the patent which seems to not require the second of those, and you'd agree with that, right? It doesn't require the second of them, Your Honor. If I could be, try to help with the Court's viewpoint of it, and you can, of course, stop me when I run astray. I think you're right. The parties, my friends and us, referred to the display limitation as a shorthand of a display limitation, but in actuality, it requires two things. The data has to be arranged to represent the physical geometry of at least a plurality of the stacked tube segments in the furnace, so it has to be arranged that way. That was added during prosecution to overcome a prior art reference which showed things like the attributes of the tubing in the sense of the wall thickness and the like, and they said, we're going to add a limitation beyond merely partitioning the data and require it to be arranged to represent the physical geometry of the furnace. Just to be clear, the term is that the data is or are arranged, which is a weird formulation. You mean that the visual representation of the data is arranged? And that's how it's used throughout the specification of the file history as well, Your Honor. If you look at the specification, one of the strongest indications, and really, while it's a claim construction issue, it comes down to a relatively stark question, which is... Well, you're losing me again, because I'm... Please. You've got these two different requirements within the display limitation. One is it's arranged so that you can determine the location of the defect in relation to physical geometry. The other one is displaying it so it looks like the furnace was. Do you agree that the NORCO charts would fit within example one? Yes, I do, actually, Your Honor. I agree the NORCO charts would fit within example one. I think what they'd be missing is that there is no displaying of the data so that it's arranged to represent the physical geometry of the stacked tube segments, and I think that flows from two bottom of column 11, discusses example one, which is the strip charts, and it says that's only an example, and then it says other ways you can do it would be to display the physical geometry. It draws a contrast between strip charts and displaying the physical geometry. So in the specification as originally written, in the patent as originally written before the prosecution, you would agree that NORCO is within example one? I would agree with that, Your Honor. I would acknowledge that. Then you have to rely on the prosecution history as a disclaimer of example one. No, I don't, Your Honor. With due respect, example one matches the strip charts, but at the end of example one at column 11 around line 56, it says the strip charts, which is example one, it says is one way that you could utilize some aspect of the invention, and then it contrasts it to examples two through four, if you will, by saying another way you could do it is to show them in their proper orientation or to show the physical geometry of the furnace. So I agree with you that example one is reflective of NORCO, but these claims, you don't need to rely on the file history or any disclaimer or anything like that. The claim language, which says that it's arranged to represent the physical geometry, is quite different than the strip charts, which have no geometric component in the sense that they're time-based. So the claims, according to you, that you're relying on are excluding example one? Yes, absolutely, Your Honor. They excluded... Even before the prosecution history? Well, let me say it this way. They were amended during the prosecution history to add the requirement that they would be arranged to represent the physical geometry. So as soon as that amendment came into place, it excluded the strip charts in example one. And holistically, if you look at the entirety of the intrinsic evidence, with due respect, I think there's no other conclusion you can reach. The first thing is, Your Honors, the claims before they were amended only required that you displayed partitioned data, and the data was partitioned so you could show different tubes, for example. That would read on example one or on the strip charts because they display partitioned data. But an addition was made that our friends essentially ignore, and it must have meant something additional to get over the prior art to add the language that is arranged to represent the physical geometry of the stacked tubes in the furnace. That was specifically added to the claims, and effectively, if you say it reads on the strip charts, which only partition, then you're ignoring the language that was added. You're ignoring the language in the claims. But the language that was added could have been directed to the first of the two things that we've been talking about, which is that the claims had to require that the defect be determinable in relation to a physical feature of the tubing. That was already in the claims, Your Honor. If I could direct your all's attention, please, Your Honor, the Court's attention to the file history. And there's one page on which we can see that specifically. Your Honors, it's in Appendix 1, and I direct you to page 14935. That's 14935. And I'll wait until Your Honors are all there. Please let me know when to proceed. It's Volume 1, Your Honor. Okay. If you look at, and the claims are all the same, so we can just look in this respect. You can look at Claim 1, for example. Before the amendment, the claims merely said, generate a display of sent partitioned inspection data. And that partitioned inspection data, if you look at the prior clause, was already done to show that inspection data relative and correlating it to the physical geometry. So what was already required by the claims before amendment was what you have in the strip charts, which is show a thin surface, for example, a thin wall on Tube 11. That was already required. But the claims were amended to add the requirement that it be arranged to represent the physical geometry of the furnace. That took Example 1 out of play. The specification tells you Example 1 doesn't do that effectively at the bottom of Column 11. And the explanation is clear. If you'd go, if I could direct the Court a few pages later to 14950. That's 14950. Please let me know when to proceed, Your Honor. Is that me? It's all right. That's my son. At the bottom of the page, with the amendment, they explain four and a half lines up from the bottom. By contrast, in the furnace tube inspection system and method of the present invention, the claimed invention, the collected inspection data is displayed such that the data is arranged to represent the known physical geometry of the furnace. This is important, the next sentence. The collected inspection data is not merely correlated to the particular tube sections of the furnace. So they're explaining what they added. No longer is a strip tube enough, because all that does is correlate. I think that hurts you, because what Winslow did is it correlated to the tube segments, but not in a way that would enable you to determine the exact physical location. And that's why it helps us with due respect, Your Honor. The point is, is that the claims beforehand might have covered something like Winslow, because you could decide in Tube 11 that there's a defect somewhere. But what Winslow didn't have, and what this amendment overcame, was the idea that you can do, which is very important in a refinery. These folks may not have the background to be able to look at a strip chart and know it. By looking at this chart, and it shows them a quarter of the way in. But that's the first part of what we looked at as being the display limitation. In other words, that you have a chart, strip chart, or actual furnace geometry chart, that enables you to find where in the section of tubing the defect exists. And that was the problem with Winslow, that it just gave you an approximation, right? Right. But I disagree with that premise. That what happened on the strip chart, Your Honor, what happened to the strip chart is, by the way, it kind of superficially, when you look at the examples, it looks like stacked tubes, but it's nothing like that. But a strip chart, there's sort of an ambiguity here. There's Winslow as a strip chart, Norco as a strip chart. Which of those are you talking about? Well, now I'm talking about Norco, for example. And I just wanted to make sure we're on the right chart on the other ones that you think are an innovation. I would say the following. The same data could be contained in both charts, but represented and transformed very differently. And here's why. If you look at a strip chart, and it shows tube 26 above tube 19, there's that many in between. It's a different graphical representation. I get that. Yes. But is there any different? There's not required by the claims to be different data. It could be the same data, but it's transformed. My understanding was that when you were doing these Norco reports, your engineers or whoever is doing these, who I would assume you would consider the skilled artisans, can look at the strip charts and look at the data there and determine where the bends are. Yeah, they might be able to determine where the bends are. But here's the trick, Your Honor, which is because strip charts are time-based and what they're doing is just doing things by time, and because the pig is what they call the thing that moves through the inspection system, because it moves at a differential rate, just because you see something a quarter of the way into the strip chart, for example, doesn't mean that's where it actually is. It leads to all these false negatives, false positives, danger for people working at the plant. I thought that was the problem with Winslow, and that in the Norco chart that was cured, that it might be more difficult to read than a display that looks like the tubing itself. But as Judge Hughes is suggesting, it had, the Norco charts had the same information and the same ability to locate the defect. It might just be a little harder to do it. I would say it's not just harder to do it, but it's a very significant difference that in the strip chart, for example, you would look and... But you were starting to talk about the fact that the pig is just time-based and that there where the data showed up in the chart. But you just said a minute ago that the data is the same. So the data would be, to the extent there were discrepancies, wouldn't the same potential errors be in the vertical bar display? No, when I met the data, and if I misspoke, I do apologize, Your Honor. When I met the data, I meant, for example, if it tells you the wall is super thin at a point, the strip chart might tell you the wall is super thin, and the invention might tell you the wall is thin. So that data would be the same. But the advantage of the patented feature, which displaying it pursuant to the actual geometry, is you could determine with more accuracy where that was occurring. The graphical representation. The graphical representation. And that's a huge... This is not an insignificant difference. How do we know that that's true? That the NORCO didn't allow that level of accuracy? How do we know that's true? Well, to begin with, the strip charts inherently are time-based. And because they are time-based, the vertical charts are time-based, too. I know you keep wanting to say that they're different, but you said the data is gathered in the same way, and the pig gathers data in a time-based thing. It's not any different than the claimed invention. Right. But then what's required is the computer-executable program then transform that data and figure out where it would be in terms of the actual physical geometry of the actual tube. If I tell you we're leaving this courtroom, Your Honor... No, it's the same data, though. It's the same... It's giving you a different graphical representation. I would say, Your Honor, that it's being processed differently to determine the actual geometry, and then it's being represented differently. The thickness of the tube, for example, may be the same data. But the relative distance from one bend to another may be quite different because the requirement in the claim now is to represent the physical geometry. Let me give you an example. We know that... My understanding was that Norco allowed that level of precision even though it wasn't displayed to look like furnace tubing. How do I know that your characterization of the Norco data as being less accurate is correct? The characterization of the Norco data is maybe, Your Honor, best viewed as the problem that the invention set out to solve. What we know from... Where in this record does it tell me that the Norco data is less accurate than the graphical representation that you say is required? Well, I will say the following, Your Honor. This was resolved on summary judgment. I can point you to a number of expert reports and declarations, and I can give you those citations where the experts explained the problems and inaccuracies of dealing with something... It's only an approximation. The experts explain, I think, to directly answer your question, and I'll get you a citation on this. Yeah, you're going to need a... They explain, but more generally... You're going to need to show me, okay? Not just tell me it's in there somewhere. More generally, I will say that I can give you at least a citation where the experts and the declarants explain that the strip charts being time-based were less accurate and reliable. I will have to look at whether I can give you a specific one on Norco as an example of those strip charts. I will... It has to be Norco, because that's what we're relying on here. But with due respect, Your Honor, I don't think it needs to be, because one thing that is clear is that Norco, just like Winslow, does not represent the physical geometry of the statutes... If you're suggesting that Norco, like Winslow, doesn't give you completely accurate data, that it only gives you an approximation, you're going to need to show me where your expert said that Norco suffers from that defect, because I had understood before that the only difference between Norco and what you say the claims require is that it looked like Tubi. It was easier to use, not that the data were different. And I would say that... And I will confer with my colleagues, and I apologize to the Court for not having that citation handy. What I will say is where we are resting ourselves is the idea that we all agree, and I think our friends agree, that Norco is a strip chart of the type of example one, and the specification tells you, which is the single best reference for interpreting the claims, of course... But I still don't understand, and you seem to be wavering on this, is whether the data is the same or different. I would say that... The data is the same. It's the same. It can be represented graphically in a bunch of different ways. You may have come up with the best one, but to say that... Concentrate on the time-based notion of the Norco one and suggest that the patented invention or the claimed invention is somehow better if it's the same exact data is confusing. It's not really the same exact data in the following sense, Your Honor, and this is where... And I apologize if you say wavering. So is the PIG operating any differently, collecting any kind of different measurements, any kind of different time-based things? Is it doing anything different than the strip chart data? I can't say that it is, Your Honor, but here's what I'm saying is the difference. And when we talk about the data, the reason that you characterized me as wavering is because we're not meeting in the middle on what we're talking about for data. Well, when we're talking about data, I'm talking about what kind of information the PIG is gathering, and I sense that you agree that the PIG is not gathering any new data. I agree with that. It's gathering the same data. I agree with that. So the difference is in the way the data is presented in the charts. Not merely that, Your Honor. When we talk about data, and I see that I'm significantly over my time, so I apologize, Your Honor, but if I may address this issue at least, when we say the same data, what happens with the strip charts is you have a time-based PIG gathering system, and at that point in time, if you have a weakness, if I could analogize it to our drive home, Your Honors, it may tell you that 11 minutes into your drive, you hit a pothole, okay? It may tell you that information. But if, depending on traffic, depending on whether the President's caravan is out there, depending on the weather, 11 minutes in, just like these PIGs operate at a different speed, 11 minutes in, you may either be still on Constitution Avenue, or you could be in different parts of I-66. You may know the road you're on, but you don't know where. The aspect of the invention that was amended and added to, the aspect of the invention that's in examples two through four, and not one, goes to the idea of taking that, reorienting it, rescaling it, laying it out, so that you know where that pothole is in the road, not just that it's 11 minutes into the drive. So it's collecting the same data, Your Honor. I want to interrupt you. Please. Thank you. Can I ask you, if this is just about the content of the visual display of information, why is that this not squarely a printed matter problem? Okay. And, Your Honor, I assume you want me to keep going. I don't have the right to sit down when we're asking questions. I understand, Your Honor, and I'm happy to answer them. Your Honor, with respect to the printed matter issue, hopefully we addressed some of this in the simultaneous briefing that we did last Wednesday. Not satisfactorily to me, so try better. Okay. Well, I will tell you, as a threshold matter, of course, with respect to the cases that we cite, for example, the Bernhardt case and the Lowry case say that when you have a computer that's processing the information, and that's the one that's generating it. Right. Put aside the computer processing of the information. To the extent that display limitation says, show me a better picture that gives me a better understanding. Visual display of quantitative information, there are lots of ways to do that. There are books written about it. Why is this not entirely about the better visual display, whether it's printed on a piece of paper or on a screen? Well, first of all, I think the better visual display is something that can be patentable. But I'm trying to avoid the obvious ambiguity of better visual display. More pixels, sure. Better processing to populate the pixels faster, sure. This is entirely, as I understand it, about the content of the picture. Yeah. And that's where I would respectfully disagree. So I'd answer it in two ways. The first aspect is inherent in the display limitation is additional processing of the data. I think even our friends don't disagree with that in the following sense, that inherent in there, what you're doing is you're reorienting tubes, you're rescaling tubes, you are transforming that information. You're not changing the tubes. You're changing the picture of tubes. You're not reorienting the tubes. You're changing the orientation of the picture of the tubes. The tubes are what they are. Right. And all I would— Physical things, right? No doubt that the tubes don't change, Your Honor. I agree with that. What I would say, Your Honor, is that there is processing going on and transformation going on when you take data that's merely correlated in partition relative to tube sections, and then you have to arrange the data so as to represent the physical geometry. This is not necessarily a simple task because of the fact that it moves at variable rates and it's time-based moving at variable rates. The information in the data is being transformed before it's just being displayed. It might be a closer question on printed matter if you put aside the computer aspect of things. If all you did is you had the original claims where you had correlated and partitioned data and merely displayed what you already had, but here you're transforming the data. You're arranging the data so as to represent the physical geometry of the furnace, and that requires transformation. It requires reorientation of the tubes. It requires rescaling. That data is being manipulated. So it is not merely a matter of just printing something out differently. It's a matter of taking the data that you might have collected from the tubes, perhaps assembling additional data with regard to the physical geometry of the tubes. But that's part of the confusion here. I think what Judge Toronto is asking is assume that you're wrong about the first aspect of the display limitation, and that NORCO gives you the same data that the graphic display of the tubes would give you, that you can find the data. It's just more convenient to have it displayed in the graphical way so that it looks like the furnace tubing. Assuming that that's all the display limitation does is give you this different kind of graphical display, why isn't that barred under the printed matter doctrine? Yeah, and I would say if you first, and you've asked me to accept that we're not going to the processing, I would say beyond that, that you're not claiming the content of the information per se. The printed matter cases I'm familiar with, if you look at Praxair, if you look at King Pharmaceuticals, you look at the variety of, they're talking about merely claiming the content, what's on the sheet of paper. And if you look and you distinguish that, for example, from DiStefano, for example, where you have categories of things. Here, you're not claiming, displaying X, Y, Zs per se. It's not claiming the content of the information. And I would say beyond that, there's a functional relationship that is distinct from the situations, for example, in the Nguy case and in the King Pharmaceuticals case where the rest of the claim can be carried out without, and it doesn't affect anything, just the mere provision of an instruction chart. Here, our contention, I understand that the court may or may not accept it. Our contention and what our belief is, part and parcel of this invention, and really what is that display step, which requires that you manipulate the data. You have to arrange it so as to represent the physical geometry of the furnace tubes and then display it. Before you sit down, can I just ask one? Please, Your Honor. It's a completely different topic. Of course, Your Honor. In your supplemental brief, you refer to the anticipation ground here as public use. Most, if not all, of the prior discussion, at least that I remember, refers to it as an on-sale bar. Which is it, and if it's an on-sale bar, which of the methods, systems, computer-readable media were sold? I see it as more, and we got involved at the appellate stage, Your Honor. I see it as more of a public use issue, more than an on-sale bar issue, in the following sense. Just so everyone has context of what happens here, some of the claims are system claims for a computer system. I think the three things I just mentioned are the ones here. Right, right. And the idea is there's no contention that we, let's say, sold to Norco the software itself, or that Norco practiced the software itself. So I'm not trying to get out of the idea of 102B by the fact that our folks may have utilized, the argument goes, may have utilized a claim system to deliver a result. I think under this Court's precedent, if it met the other factors of 102B, you could end up in a situation where that's a bar, even though we didn't give the public and didn't give the customer that software. Point is, that's not our argument. But it is not a public sale in the sense that we didn't sell the software system, we didn't sell the method. This may not make any difference, but I think it still would fall within the sale category. If you look at ScalTech, for example, if you perform a method for compensation, that's a sale of the method. It doesn't fall under public use. I don't think it makes any difference. I don't think it makes a difference in the end of the day, Your Honor. I will agree with Your Honor that you could view the use of the system claims and then the sale of the end product as that situation. The method claims a little murkier. I think in the end of the day, we would concede, which we strongly disagree that you get there, but that if you carried out all of the steps, if it had all of the elements, that we view it as a use in the sense that we used it. But we sold the product, and whether you wanted to do it under ScalTech and say that that was a public sale, that was an on-sale bar, I think you get to the same place. I wanted to make it clear that in our appeal, we're not contending that there is a difference in the sense that because we kept it to ourselves that it couldn't generate a 102B. That is not our contention. I asked the question in part because it seemed to me it might have some bearing in a way helpful to you on claim either 30 or 40 or both. That is, what is on the disk might be one thing. What was used might be another. There, I agree with you on claims 30 and 40. Hopefully, we've made that aspect clear, which is those both rely on something called the bend detect feature, where there was an automatic detection of bends. And there's one thing that's very clear from the record that we emphasize is if we were to use that feature on those NORCO reports, there would be Xs. And there are no Xs, which is part of the reason we think it's either on sale. With respect to claims 30 and 40, that the capability isn't enough to make it anticipated that you would have to find that it was actually used in the performance of the service. Right. We don't believe that they've proven by clear and convincing evidence that there was capability in the actual code that was used to generate NORCO. But in addition to that, Your Honor is correct. If they didn't use that feature in terms of generating it, then we don't think in that circumstance it would generate a FinJAM type of an issue. Think, for example, making widgets in a factory, Your Honor. Just because you have the capability in the factory of doing something else, it doesn't put it on sale with that machine. Here, if they didn't utilize the function, which again, we disagree it was even available, that it was even the executable code that was used could have done it. But here it's very clear it didn't do it. To hold us to an on-sale bar for some capability that I guess theoretically could have been on our computers, capable on our computers and never used, I think that would push the law further than either FinJAM or Fantasy Sports would allow. And it would be unjust, the fact that we have some capability in our computer that wasn't used. Yeah, but maybe there's a difference between a feature that's commented out and couldn't be used and a feature which is in the program which could be used but just didn't happen to be used as part of the performance of the system. Your Honor, the case law, I've reviewed the case law on this and respectfully, I think it's a little bit in some gray holes, if you will, whether the capability aspect of FinJAM would somehow apply to something we didn't use in carrying out the product. I would submit that it would be wrong to hold us responsible for not using some aspect of feature even if it did have the capability in our computers of doing it. But I don't think you also need to get there. Suppose it wasn't commented out but the feature was in the program and the program was used. Isn't that sufficient even if because of the factual circumstances, one feature of the program wasn't used? I would disagree in this circumstance and here's why. It's not like we sold the product to a customer then could use or not use the feature as in FinJAM, as in Fantasy Sports. The mere idea that in our computer system, we could have done something that we didn't do, even if true, that that would create some kind of a bar. I would look at, for example, the electric battery case from the Supreme Court, which talked about the actual use when manufacturing something, putting that into a 102B kind of a category. So the electric battery case would be one example. But I really think that you would stretch the FinJAM. Look, I understand in FinJAM, if you sold a computer product, if I sold a computer product... But shouldn't you got a pretty good argument if it's commented out? Yes, I agree. It has to be activated. But if it's just part of the program and could be used and it just happens that in running the program, you didn't use that particular feature. I'm not sure that's the same thing as when it's commented out. I think that's an important question and I actually respectfully disagree with Your Honor, respectfully, which is, here's why. I get the idea of you having put a program, let's say that I sell to Judge Toronto, that has a capability in it to do something, that I've commercialized and put that on sale. I think I'd look at electric battery also. But I think if I don't use that at all in manufacturing what I then sell, have I commercialized that unused technology? I don't think so. Okay, are there other questions? I think we're done for the moment. We'll give you two minutes for rebuttal. Thank you very much, Your Honors. Mr. Fulkerson? May I please, Court? Let's envision the data for a moment. Can we just, since we were on claims 30 and 40, can we just stick with that for a moment? Absolutely. And it strikes me in reading the declarations that it's a bit of a stretch to say that we're in the area of a sham affidavit. Because there are detailed explanations as to why mistakes were made the first time around here. All of which are incorrect and inconsistent with the record. And the court below went straight through that, every single aspect of it. Well, I don't think the court did go through every single aspect of it, actually. It seemed to be sort of summary. Let's take the question of whether the witness, what is his name, Dee Lorenzo, was looking at a 2004 program and wasn't aware of it. And the 2004 program couldn't have been used in creating the Dorco strip charts, right? So he says, I didn't realize that I was not looking at the earlier version of this that could have been used with Dorco. And in fact, if I looked a few pages earlier, I would have seen that this was a 2004 program, which, of course, could not have been used for Dorco. Let me give you the exact references to that. There were two programs. Bendetect.M, which their experts say was used in the Dorco report, and which contains composite bend indicators. That's in paragraph number 36 of their expert declaration. Then there's Bendetect.A, or Revision A, which is the one I mistakenly asked him about instead of Bendetect.M. Bendetect.M also has the composite data marker information in it. That may be, but he didn't testify about that, right? He did, not just with respect to those lines, which were repeated in Bendetect.M, which was dated August 28, 2002, but he said it in about five, six different ways. He said that the only automated system that was in effect was Mr. Bondurant's six-algorithm averaging system. That's the composite data marker. Calling it the automatic system, he volunteered and referred to it that way himself without any leading from me on eight different occasions. The reason that it doesn't show X is because when it popped up, there were false positives, he testifies, and he went in and manually marked each and every one of them. That's why they have black tick marks instead of Xs. The way that that testimony, that supposedly exonerating testimony was given, was this composite data marker couldn't exist until July 8, 2004, when this Bendetect.M Revision A was drafted. Well, that's a month and a half after it was claimed in the provisional patent application, an impossible proposition. Okay, but where is it that he testifies that the earlier version, I don't know what, the M version, which is like 2002, where does he testify that the M version was used for Narco? Only by referring to it as the automatic six-part algorithm that Mr. Bondurant created. Okay, so there's an inference that you're making that he was... Not really. ...that the 2004 and the M version are the same in this respect, right? Not really. And if the court will take a look at the appendix, if I can take a moment just to find it, the appendix at 18765, the Caligari... Which volume is this? That's appendix 18... What volume? I do... ...3, Your Honor. Volume 3. This is the expert report. 18765. This page is all yellow. Is this confidential? It may be. Well, then you shouldn't be reading it in open court. Well, I will simply make reference to it. I'll respond as required by you, of course, but not otherwise. I mean, this stuff should not be marked confidential. I don't understand why it's marked confidential. I did not, but my... I could tell you more globally, Your Honor. I'm not sure it's going to really help because it's a bunch of code and language about what the code means, and I'm certainly not a computer science guy, so this code doesn't... You don't have to be. You honestly don't have to be. When their experts say that this particular code was used, it's not the revision A, which they're complaining about and say was commented out. It is the earlier version in response to our argument that they anticipated claim number 40, which required the use of... Okay, but this is your expert's testimony. No, it's theirs. Or their expert's testimony, but this is not the deposition testimony that the district court relied on. You're correct. The deposition testimony that the district court relied upon was not just the statement that the court is focused on here relating to a composite data marker, but to the eight different times that the witness said we used an automatic bend indicator, and the only automatic bend indicator identified ever in the record was the composite data marker. So he didn't testify to it once. He testified to it eight times, and he described how it didn't work, how he had to override it, how it made the processing quicker. It is impossible for it to be an accident when he repeated it eight different times. The argument that X marks the spot, and there was no X... People make mistakes, and I don't think the sham affidavit doctrine is designed to say that every time you make a mistake, you can't correct it for summary judgment purposes. What the cases say is you can only correct it if it's a blatant effort to take back something without a good reason. And DiLorenzo went on at length explaining how he made the mistake and why he made the mistake, and it may not be credible if you were in front of a jury. It may not be credible, but it doesn't seem to me that a court can just say, oh, well, forget about it. I don't believe it. As the district court said here, it's not credible. That's not what the district court is supposed to be doing. Actually, it is under the Third Circuit principle. If your court takes a look at the Dalbert versus NRA case, the Third Circuit law at page 392 says the question about whether or not you have created an explanation of confusion or if you have confirming information is reviewed on an abuse of discretion standard. And so the question of whether or not that information is satisfactory, that's the word used in the Third Circuit, is a determination made under the abuse of discretion standard. But maybe, but it's not, the district court's not supposed to be making a credibility determination on summary judgment. That's not the right approach. And that's not what she did. Well, that's what she said she did. She said his explanation is not correct. I know she used that word. Just as in Jimmy, this court used the word credibility. It's another word of using the word plausible or satisfactory that are also used in the sham declaration doctrines. The court has to be, just like in a Dalbert challenge, that has to be the determiner of whether or not evidence that contradicts sworn testimony is admissible. And in this case, it's an admissibility determination under the law, just like Dalbert, just like whether or not state of mind is relevant or any other admissibility determination. And the trial court has to have discretion in that connection. And it is entitled to substantial deference. If the court has any question whatsoever about whether or not the information in the exonerating claims is correct, I would ask the court to take a look at the supplemental declaration of Mr. Schaefer and Mr. Rowell in the record at 184 through 19195. And I do not know what volume that is in. We literally go line and verse through every single claim that is made in the exonerating argument. And if the court has any doubt about whether or not the district court charged its discretion properly, then I think that that resolves it. Because it's not a question of opinion. We're looking at the physical documents and what they do. It is not a question of whether or not the expert's interpretation is or is not in a particular manner. It's straight off the documentation. What you're looking at is you're saying the documents contradict the testimony, that the corrective testimony, that the expert shows the testimony. That's not what the sham affidavit document is about. That's what a trial is for. I would also say that the courts, I will respectfully disagree, but also say that the court would have been justified in excluding an under 30E or Rule 16 because it constitutes expert testimony as to whether or not a composite data marker was a part of the software. Both were violated. Rule 30B-6 was violated where a 30B-6 witness's testimony was contradicted by other parties. And the court could have justified a decision on any one of the three. Can I ask you one specific thing? Mr. Moran, both in his briefing this morning, emphasized the absence of the Xs. I'm having a little hard time understanding. I know your response had something to do with the idea that the program at that stage created false positives. Yes.  It's that therefore that I'm missing. Okay. Let me explain. In the August 28, 2002, invention disclosure by Mr. Bondurant, which is a part of the Lunum Declaration, he shows Xs as of August 28, 2002. And in his description of figures one and two, which become figures three and four of the patent, the Xs are there as of that time. Then Mr. DiLorenzo testifies that he used the automated program and it produced these prompts. But because it produced false positives, he went through and manually marked each one of the bins. Where are the Xs? Are the Xs your prompts? Why are the Xs not being produced? I don't know. So that DiLorenzo has to put them in. I do not know. He testified that whether it was an X or it was a mark or it was a white stripe was irrelevant. That was his testimony. The specification says an X. I thought in his corrected testimony he said I can tell this wasn't used because it didn't produce Xs in the Norco charts, right? Yes, an additional contradiction to his original testimony. But there's an explanation there as to why his original testimony about the use of these things was inaccurate. And he may be wrong, he may not be believable, but I just don't see how you can say that that testimony has to be dismissed as a sham affidavit. Because his testimony is not inconsistent with any other fact he's pointing to. The revision A writes it out. It writes composite data markers out as of July 2004. That's on the face of the software. I don't have to reconcile that. When he's saying I used the automatic version and it was this six part process, he says it eight times. I don't have to reconcile that. And when the X disappears, it apparently disappears because he's manually marking each bend. If he had just left the automatic system on, apparently it would have produced an X. But he does testify and it reconciles away the conflict that he manually marked each bend. Now with my time remaining. Now I think you should turn to the display limitation. Let me explain that as simply as I can. Partitioning has been conceded throughout this case that the data was partitioned. What that means is that the data is reconciled to some physical object in the furnace. Imagine that it is creation of a data tinker toy. Could be blue, could be green, it could be red. And when that two dimensional script. You seem to be differing about whether the partition limitation or the display limitation requires that you be able to locate the defect in relation to the physical feature of the tubing. Correct, and they're interconnected. Yeah, if I may explain. Once you partition, then the error term that comes from just using an axial encoder through a mile of furnace goes away. Because now you're reconciling the data to the beginning and the end of a known length of a tube segment. Now, whether or not that data tinker toy appears as a quarter inch. How do they do that? Say that? How do you do that with the pigs? Is it because you can tell where they're going through a bend? Yes, what happens is in an ultrasound system, you need the system to be perpendicular for the wave to return with enough power to get a reading. When you go into the curve, what happens is the wave gets distended. So instead of returning to the transducer, it hits the pig at a different part, not back to the transducer. So the data looks different somehow when it's going through a bend. And you can tell that based upon the readings. Correct. When you go through a bend. Is that kind of reading in the strip display? Yes. It appears as a white stripe in the original Norco report. It appears as a black tick in the second Norco report. But here's my overall point. The difference between our different images and our arguments about the different images is that the two-dimensional strip chart is not merely time-based. Once you partition it, you cut it up into known slices, say a 50-foot tube. And now you have reconciled down the error term. Look at figure four, for example, in the Norco report, and it shows in the upper right-hand corner positional location within two-tenths of a foot. And it's very clear in the record that that's what is being given. The only thing that happens in the difference of the making of a two-dimensional strip chart and the other figures five and six is that those Tinkertoys are all replaced with one color and they're flipped back and forth. But is there some place in the record that tells us that Norco is giving the same level of accuracy as the graphical display? Where do we find that? Let me see if I can find the pen slides very quickly. The Norco report, it appears in about half a dozen places, and I just need to find it for you. In volume two? Yes. The Norco report, it's 1654, 541 through 605, in the... Say those numbers again. Yes, please. In page 16, 541 through 605, if the court will turn to the section referring to the position module, there are a picture of the different modules. What page? I don't have a pen slide to that page. You should bring your appendix with you. This happens all the time. I don't understand. You really need to have your appendix. We're going to ask you about it. We need to be on the same page. Yes, Your Honor. In the section of the report referring to the position module. One problem I'm having is that those words, position module, I'm not finding on the table of contents, so I'm having a hard time figuring out how to find it. I apologize. It's right after the picture in the report that shows the various modules. It refers to the module that determines position. It refers to the fact that it has an axial encoder, roll encoder, three accelerometers. Why don't you borrow those accounts? I was just getting ready to drop that, Your Honor. Here you go. Thanks. Of course. There may be my markings on those. No, that's not important. You won't be influenced. Here we are. Your Honor. If your court will look at page 16, 547, just below the photograph of the FTIS tool. It says the position module below that includes actual pitch and roll sensors that continuously monitor the telemetry and orientation of the tool during an inspection. This information is essential to properly identify the positioning of the collected data. The module houses two axial encoders that record the tool's axial location within the furnace coil, a roll encoder that tracks spiral rotation or roll, and two accelerometers that record the vertical orientation and unit acceleration. Dealing with the collection of data, I don't think there's any question but that the data is being collected. My understanding is that they contend that it's not being shown in the Norco strip charts, but somehow the Norco strip charts are showing different data than you would get in the graphical display. No, it's the same data. Well, that may be, but I'm just looking for a site that tells me that. So is, maybe I'm completely misunderstanding this, and it's very likely, but my sense is that the strip chart is based upon time, and so it doesn't show the tubes in an exact graphical representation, and the segment lengths may not even be the same for each tube on the chart in terms of time. You may have one that's this big, and then one is bigger, one's smaller, even though they're the same actual physical length at the same time, and what the vertical bar display is is somehow transfer that time-based data based on knowing where the bins are to an actual, it either has to stretch it out or shrink it to make them all the same physical length. That's correct. When you move from, if I understand the question, when you move from figure three to figure five, you just stretch the data to a common length, you flip bar two over number one, flip bar three over number two, flip bar four over number three, and so on. That's the only difference. That's the only processing that comes straight out of a MATLAB program. Okay, that may be, but you can't testify here, and we're struggling with... I'm happy to provide you the slides if I may. Exhibit number 222 and the deposition of Mr. Bondurant, which is attached as exhibit C, and is at... What page? That is at 16.255 through 56. I believe that's in volume two. 16 what? 16.255. Sorry, I thought it was 16.255. What page is it? I'm not sure where it has gone to, because at any rate, I will find it, and I'll provide you the pen site to it, Your Honors. He testifies that the only difference between figure three and figure five is what I've described, taking the data, attaching it to a standard length, and flipping it back and forth. Let me just see what my understanding is. So if I'm looking at three or four, I don't think it makes any difference. The horizontal axis is a time interval, but that's really quite irrelevant. What's important is where each of the 1x, 2x, 3x, 4x, 5x, and those are marked where if you look at it, there's either a little white line or in the other one, more like a black line. Exactly. That is the information that identifies the bends from, among other things, the tilting of the censoring device. Correct. Right. So even though the horizontal axis is time, the chart is, in fact, showing at each of the x's where the tubes begin and end. Correct. And then when you go to five, all you do is making all the tubes the same length and flipping them over. Correct. Okay. That's exactly right. In other words, you start with time as you've asked. Then once you have time, you mark it, the bend, you have a known length, and then you can do whatever you want. It's the same accuracy, regardless of how the data is displayed. Exactly. And is something in the spec? We have kind of two slightly different things, right? We have a question of Nucor, which is not a claim construction matter, and then we have a claim construction matter. So just focusing on the claim construction, is there something in the specification that tells us that all these little x's under the white lines or the black lines are the bends? Yes. What's that? If the court would take a look at, under example number one. This is in column 11? It's in column 11, column 10 and column 11. I believe it is in column 11. It refers to, it may be expressed as either an x, or it may be expressed as a black tick or a white stripe. Right at the bottom of column 10? Yes. I believe that's in the bottom of the 10, roughly in line 50 in that range. But we'll be happy to provide that specific reference to you. The other part that it appears is when you transverse over to column 11, and they're discussing the efficacy of the Norco type report, they say you can determine problem areas with a single glance, which is the same language that is used to describe figures five, six, and nine after the data is stretched and then flipped. And so insofar as its capability to tell an operator or a person of ordinary skill what's going wrong with the furnace, the same word formula is used by the inventors in the specification to describe that. I am way beyond my time. Okay. Thank you, Mr. Fulkerson. You're finished? We're done. Thank you. May it please the Court, briefly, Your Honor, starting with the questions that you asked about the sham affidavit rule. There is more than adequate explanation in both the Daubert case that he cites and the Chase case make clear that if there are explanations or corroborating evidence, you shouldn't ignore the affidavits. But one thing answers it that I haven't heard any response to, which is there are two expert reports that were submitted explaining why there was no anticipation. Those can be found in the record, Your Honor, at A18691 through 726 and A18731 through 67. And so those weren't thrown out, so you at the very least have material factual issues. The record also makes clear that there would be Xs, not might be Xs, but would be Xs. Even the MATLAB M, or Bend Direct M program that my friend referred Judge Toronto to on page A16988 indicates that there would be in the code black Xs placed if that, those routines had been run. So irrespective of what you find, Your Honors, irrespective of what you find with respect to the display limitation, at least claims 30 and 40, there are disputed factual issues, even in respectfully in my friend's exchange with Your Honors, you saw the factual issues. Where in the code is this? What code was used? The record below is far from clear. This is not an issue that should have been resolved with respect to claims 30 and 40 on summary judgment. So at the very least, there should be a remand of those irrespective of where you end up on the display limitation. With respect to the display limitation, I think it boils down respectfully to my friends to this, which is the claims, and I pointed you to this earlier, Your Honors, were amended. Whereas before, they only required a display of partition information. But you were going to give us a site to show that, in fact, NORCO has the same accuracy problems as the prior art. Yes. Yes, Your Honor. And apologies. I have a footnote that I posted that my colleagues have referred me to, and I've checked a couple of them. But I want to be fair and be accurate. The NORCO reports are strip charts. They're the type of strip chart in Example 1. There's no dispute. I have a number of citations to tell you about the inaccuracy of strip charts, of which NORCO is the type. I can't tell Your Honor, standing here today, from the record, specific citations on NORCO. So I will give you the citations. They will tell you how strip charts are inaccurate, give you false positives, give you false negatives. There's no question whether the prior art strip charts had some accuracy problems, but that's not the issue. Respectfully, respectfully, I think if you say this category, this way of displaying, this way of processing and displaying information has problems, and NORCO is one example of those. The problem is those issues could be coming from two different things. They could be coming from the fact that the prior art system's detection sensors are not good enough, and you're getting problems because the data is bad. And your data sensors and your programs and whatever you do are better at getting accurate data and where the bins are, or what you've done is take that data somehow and transform it in a way in the non-strip chart parts that make it a better representation. And I think in fairness, you're, I think, relying on the second argument, not the first, because if the data is in the same in both instances in NORCO and the patent invention, then it either has the same problems or it doesn't have the same problems. I think, Your Honor, respectfully, Your Honor, I think it comes down to this, and I think this is... I think there are three possibilities here. One, it's the same data, and I don't think you dispute that it's the same data, as I understand it. Second of all, is all the data used so that it achieves the same level of accuracy? And the third one, is it easy to use? And I think we keep stumbling about the second one here, and I'm not seeing anything that says that the NORCO charts don't give you the same level of accuracy as the charts displayed graphically. Let me read something into the record and then answer your question in connection with it, and I'll give you the following citations, Your Honors. A14230-32, and that would be the primary one we would rely on. That is by one of the inventors. A18756-58, that's by the experts. A18745, by the experts. 19075-80, by a Chevron employee who said how much better this new system was for them. That's true, but what you need to show us is something where somebody says NORCO suffers from the same problems as the prior art because it's not completely accurate. And where I end up with that is twofold, Your Honor. Where I end up, and I have been handed a note that says there's some NORCO analysis of that at A18756-58, but here's where I come back to. There's two answers to your question, Judge Dyke, respectfully, and this is the best I can do. The first one is, NORCO is just the use of the strip charts that these citations say were inaccurate and unreliable and hard to use. So do they say NORCO in those citations? I'm told that one of them does. But in any event, when you say these systems are no good and NORCO is just running that system, then I think you end up in the same place. But here's where the rubber hits the road on the whole thing. The claims before they were amended required displaying partition data. So that the claims before they were amended said, show us which tube the defect is in. They already said that. And then they were amended afterwards to add an additional requirement that they were arranged to display the physical geometry of the stacked tube segments. That was a change that masked the bottom of column 11, which makes clear that whatever they are, strip charts are not arranged to represent the physical geometry of the furnace, no matter what. I think we're out of time. OK, thank you, Your Honor. Appreciate your time, Your Honor. Thank you very much, Your Honor.